**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

John Bemiss,

           Plaintiff,

v.

Andrew Alcazar, et al.,

           Defendants.

No. CV-23-01481-PHX-ROS

**ORDER**

This dispute arises out of Defendants' alleged denial of benefits owed to Plaintiff pursuant to a top hat plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff John Bemiss filed suit for equitable, injunctive, and monetary relief against Defendants Russo and Steele LLC ("R&S LLC"), the Russo and Steele Phantom Equity Incentive Plan (the "Plan"), and Andrew Alcazar (as administrator of the Plan) ("Alcazar"). (Doc. 1, "Compl."). Defendants filed a motion for summary judgment on all five claims. (Doc. 70, "Mot."). For the reasons set forth below, the Court will deny summary judgment on Count I and grant summary judgment on Counts II, III, IV, and V.

## BACKGROUND

All facts set forth below are undisputed or not subject to reasonable dispute based on the parties' proffered evidence unless otherwise noted. Both Plaintiff and Defendants filed separate statements of fact in support of their positions. (*See* Doc. 71, "DSOF"; Doc. 76, "PSOF").

John Bemiss was employed at R&S LLC from approximately October 15, 2005 to

approximately March 9, 2021.  R&S LLC is an auction company that holds and sponsors car auctions in various states, including Arizona, California, Nevada, and Florida.  Andrew Alcazar is the managing member of R&S LLC, which he owns with his wife, Josephine Alcazar.  Bemiss' duties in the company included consigning vehicles for the company's auctions and attending and assisting with the auctions themselves.

In a cover letter dated July 20, 2012, Alcazar (on behalf of R&S LLC) introduced the Russo and Steele Phantom Equity Incentive Plan to Bemiss as an "opportunity for [the Alcazars] to demonstrate how much [they] value [Bemiss'] commitment and mutual investment that goes far beyond just [their] business."  The Plan, signed on July 17, 2012[1] and made effective on January 1, 2012, is a top hat plan under ERISA that was unfunded and maintained by R&S LLC primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.  Bemiss was the sole designated participant of the Plan, and Alcazar was the Plan Administrator.  On July 18, 2012, R&S LLC reported the Plan to the U.S. Department of Labor pursuant to DOL Regulation § 2520.104-23.

Under § 7.02 of the Plan, the Administrator has exclusive authority to:

(a) make, amend, interpret, and enforce all appropriate rules and regulations for the administration of the Plan; (b) decide and resolve any and all questions arising in connection with the administration, interpretation, or application of the Plan; and (c) take any action as it determines is desirable or appropriate in carrying out its duties.

Additionally, § 7.02 provides:

A decision or action of the Administrator with respect to any question arising out of or in connection with the administration, interpretation, and application of the Plan and the rules and regulations promulgated hereunder shall be final, conclusive, and binding upon all persons having or claiming any interest in the Plan.

Section 7.04 of the Plan states the Administrator has "sole and absolute discretion" to "make all initial determinations with respect to filed claims" and reconsider any denials

---

[1] The parties do not explain the discrepancy between the date when Alcazar wrote the cover letter to Bemiss presenting the Plan and the date when the Plan was signed.

1    and determine whether the denial will be upheld or reversed.

2         Pursuant to the Plan, Plaintiff accrued and vested in certain monetary benefits over

3    time.  Section 4.01 of the Plan outlines R&S LLC's required contributions as follows:

4         (a) 6% of the first $250,000 of growth over the Baseline then in effect; or (b)
          8% of the full amount of growth over the Baseline then in effect if growth is
5         greater than $250,000 but does not exceed $500,000; or (c) 10% of the full
          amount of growth over the Baseline then in effect if growth exceeds
6         $500,000; plus (d) $10,000 if growth does not exceed $500,000 but net
          commissions income is $2,500,000.00 or greater for the year.
7

8    Section 2.01(c) provides that the "Baseline then in effect" is determined as the Baseline for

9    the year immediately preceding the Plan Year for which the contribution is made.  The

10   Baseline for 2011 was defined as $3,300,000.00.  The baseline for 2012 was defined as

11   $3,399,000.  And the Baseline for 2013 was $3,500,970.00.  Section 4.01 provides "in

12   determining the amount of each contribution, the Company will determine the amount of

13   'growth' and the amount of 'net commissions income.'"  Section 6.01 empowers Bemiss

14   to begin receiving his vested benefits under the Plan at certain trigger dates, including the

15   date of separation from R&S LLC.

16        On June 8, 2021, after Bemiss' separation with R&S LLC, he made a claim for

17   vested benefits under § 7.04 of the Plan.  On June 25, 2021, R&S LLC filed a separate suit

18   against Bemiss in Maricopa County Superior Court (Case No. CV2021-010159) related to

19   his employment for breach of fiduciary duty, replevin, and declaratory judgment.[2]  On

20   September 14, 2021, Alcazar issued a 4-page written determination awarding Plaintiff

21   monetary benefits totaling $104,980.65 to be paid out in five annual gross payments of

22   $20,996.13.   The determination stated although the benefit computation totaled

23   $134,980.65, the benefit was reduced by $30,000.00 because Bemiss received an earlier

24   distribution of the plan in 2016.[3]  Attached to the determination was a check for the first

25

26   _____
     [2] A stay was entered in that litigation via stipulation on March 3, 2023 and was lifted via
27   stipulation on March 27, 2024.  That case was designated as a Tier 3 case because R&S
     LLC pleaded that monetary relief could exceed $300,000.
28   [3] In his Declaration, Bemiss disputes ever receiving $30,000 from Defendants. He states:
     "I am aware than an account with approximately $30,000 was opened and maintained by
     Josephine Alcazar. I understood said account to be for my benefit under the Plan, however,
     I never received the funds in said account, nor was that account ever titled in my name. I

1   $20,996.13 payment, which Bemiss never cashed.

2       At the time the Plan was created, R&S LLC only held or sponsored two annual

3   auctions: one in Scottsdale and one in Monterrey.   At various times after the Plan's

4   inception, R&S LLC held or sponsored additional auctions in Las Vegas, Newport Beach,

5   and Amelia Island.[4]  Alcazar's determination was based on a commission income revenue

6   calculation including only the Scottsdale and Monterrey auctions, as they were the sole two

7   annual auctions held or sponsored by R&S LLC at the Plan's inception.

8       On October 27, 2021, Bemiss, via his counsel, appealed Alcazar's written

9   determination and disputed the computation of commissions and the ultimate benefit owed,

10  which Bemiss believed to be $215,009.00.  His calculation was based on an interpretation

11  of the terms "growth" and "net commission income" to also include commission revenue

12  from any new additional auction—namely Newport Beach and Amelia Island.[5]

13      In an undated letter,[6] Alcazar denied Bemiss' October 27, 2021 appeal stating:

14      [T]he Plan was adopted for the purpose of allowing you to recognize your
15      value to the Company and to allow you to participate in that value.  At the
        time [of the Plan's adoption], the Company only operated the Scottsdale and
16      Monterrey auctions and the benefit was crafted specific to those auctions.
        The Plan grants me, as Plan Administrator, the discretion to interpret the Plan
17      provisions.  The decision regarding your benefit reflects my intent in offering
18      the Plan to you as expressed in my letter of July 20, 2012.  For this reason, I
        am reaffirming that decision.

19
20      Bemiss filed suit on July 29, 2022, asserting five claims: (1) denial of benefits under

21  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), (2) denial of benefits under ERISA §

22  ─────────────
    ultimately never received the funds in said account nor have I received a distribution from
23  the Plan of $30,000. I could see the balance of the account, but had no control over
    withdrawals of the funds. After this litigation began, the funds were withdrawn from this
24  account."
    [4] In their statements of fact, the parties do not specify the years in which the additional
25  auctions were held. The Complaint alleges from 2013 to 2018, R&S LLC held additional
    auctions in Newport Beach; in 2013 and 2014, R&S LLC held additional auctions in Las
26  Vegas; and in 2019, R&S LLC held an additional auction in Amelia Island.  (Compl. at 3-4
    ¶ 8).  Defendants denied these allegations in their Answer.  (Doc. 43 at 3 ¶ 10).  However,
27  this dispute does not affect the decision because it is not material.
    [5] The October 27, 2021 appeal does not mention auctions in Las Vegas.
28  [6] The letter provided Bemiss with a 60-day appeal deadline extension to April 29, 2022.
    Based on this timeline, the Court assumes this letter was written on or around February 28,
    2022.

                                    - 4 -

503, 29 U.S.C. § 1133, (3) injunction and specific performance under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), (4) statutory penalties under ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), and (5) interference and retaliation under ERISA § 510, 29 U.S.C. § 1140.

## LEGAL STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. *Id.*

At summary judgment, the Court considers only admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B). When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). ERISA cases involving issues of contract interpretation under the abuse of discretion standard adhere to specific legal principles on summary judgment. These specific principles are set forth below in the analysis below.

## ANALYSIS

Defendants move for summary judgment on all five of Plaintiff's claims. For the reasons that follow, the Court denies summary judgment on Count I and grants summary judgment on Counts II, III, IV, and V.

/ / /

1    **I.    Denial of Benefits (Count I)**

2         Plaintiff's first claim for relief against the Plan alleges Plaintiff is entitled to a

3    greater benefit payout from the Plan than what the Plan Administrator determined in the

4    administrative process.[7]   (Compl. at 9-11 ¶¶ 27-36).   Under ERISA, a participant or

5    beneficiary may bring a civil action "to recover benefits due to him under the terms of his

6    plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

7    benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

8         The parties' disagreement regarding the appropriate value of the benefit payout

9    hinges on their differing interpretations of certain terms in the Plan; namely, "growth over

10   the Baseline then in effect" and "net commissions income."  While the term "Baseline" is

11   defined in § 2.01(c) of the Plan, the terms "growth" and "net commissions income" are

12   undefined.  However, § 4.01 vests discretion in R&S LLC to "determine the amount of

13   'growth' and the amount of 'net commissions income.'"  Defendants define "growth" and

14   "net commissions income" of R&S LLC as based solely on the company's commission

15   revenues with respect to the Scottsdale and Monterrey auctions—the only two auction

16   revenues that formed the Baseline value defined in § 2.01(c).[8]

17        Plaintiff, on the other hand, interprets the terms liberally as encompassing the

18   company's overall growth, including commission revenues from all auctions Plaintiff

19   participated in, after the Plan's creation.  For the reasons set forth below, the Court finds

20   while Alcazar did not abuse his discretion in interpreting the undefined terms as proscribed

21   in his written determination, genuine issues of material fact exist with respect to whether

22   Defendants previously disbursed $30,000.00 to Plaintiff.   The total amount owed to

23   Plaintiff by Defendants turns on this disputed fact.  Because Defendants have failed to meet

24   their burden as discussed in Section I.C., *infra*, summary judgment is denied on this issue.

25   ---

[7] The Plan Administrator determined the aggregate value of Plaintiff's vested accrued
26   benefit under the Plan as $134,980.65.  However, because of an alleged distribution of
     $30,000.00 to Plaintiff in 2016, the net undistributed benefit amounted to $104,980.65.  In
27   his administrative appeal, Plaintiff demanded $215,009.00.  However, in his Complaint,
     Plaintiff alleges he is entitled to $495,148.00 in benefits.
     [8] The Plan is silent as to the basis of the Baseline value; however, it is undisputed that
28   Scottsdale and Monterrey were the only two auctions held or sponsored by R&S LLC at
     the time of the Plan's creation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    A.  *Contract Interpretation*

      An "ERISA plan is a contract" and the Ninth Circuit applies "contract principles derived from state law[9] ... guided by the policies expressed in ERISA and other federal labor laws" when determining whether a plan administrator's interpretation was reasonable. *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007).  Generally, "[i]n contract cases, summary judgment is appropriate only if the contract or the contract provision in question is unambiguous." *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).  "A contract or a provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation." *Id.*  "[I]n deciding a summary judgment motion with respect to an ambiguous contract, some evidentiary support must exist for the competing interpretations of the contract's language. *Econ. Forms Corp. v. L. Co.*, 593 F. Supp. 539, 541 (D. Nev. 1984) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 701 F.2d at 97).

      "When disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties." *Gilliam*, 488 F.3d at 1194 (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)).  A court "must enforce [a plan] as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it." *Id.* at 1195 (quoting 11 WILLISTON ON CONTRACTS § 31:5 at 299 (4th ed. 1999)); *Richardson v. Pension Plan of Bethlehem Steel Co.*, 112 F.3d 982, 985 (9th Cir. 1997) (stating the terms of the plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience").  Moreover, where the terms of an ERISA plan are unambiguous, the court should disregard extrinsic evidence of intent.  *See Pierce Cnty. Hotel Emps. and Rest. Emps. Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1327 (9th Cir. 1987).  On the other hand, where the terms of an ERISA plan are ambiguous, a court typically "will examine extrinsic evidence to determine the intent of the parties." *Gilliam*, 488 F.3d at 1194 (quoting

---

[9] The Plan, according to § 9.07, is governed by Arizona law.

1   *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)).

2          The parties disagree over the proper interpretation of "growth over the Baseline then

3   in effect" and "net commission income."  These terms are undoubtedly ambiguous because

4   they can reasonably be interpreted in more than one manner.  Defendants even admit as

5   much.  (Doc. 79, "Reply," at 4) ("These terms create some degree of ambiguity because

6   they are not fully defined in the Plan[.]").   However, Defendants argue "growth" is

7   necessarily tied to the defined Baseline, which was $3,300,000.00 starting in 2011 and

8   increased by 3% every year.  The initial determination letter from Alcazar to Bemiss stated:

9          The Plan Administrator has determined that both terms should be interpreted
10         to mean commission revenue of the Employer derived from those annual
           Auctions that the Employer conducted at the time of the inception of the Plan
11         for which a plan participant works during the Plan Year.  Thus, in your case,
           Employer commission revenues with respect to the Scottsdale and Monterrey
12         auctions will be used to determine whether or not you are entitled to a benefit
13         in any year, and if so, the amount of such benefit.

14  (DSOF, Ex. B-3, p.2).  Further, in his deposition, Defendant Alcazar testified the Baseline

15  data was based solely on the two auctions R&S LLC held or sponsored at the time the Plan

16  was created in 2012—Scottsdale and Monterrey, even though these two auctions were not

17  explicitly referenced in the Plan as the only auctions for determining the Baseline.  (DSOF,

18  Ex. A, p. 110 ¶¶ 6-20).  To assert otherwise, according to Defendants, would grant Bemiss

19  an unintended windfall.  Defendants provide the following example: if it is assumed that a

20  new third auction in a subsequent year might generate an additional $1 million in net

21  commission revenue (leading to a hypothetical total of $4.3 million in net commission

22  revenue from three auctions, based on the initial defined Baseline value of $3.3 million), it

23  would demonstrate unreasonably rapid growth in the revenues over the Baseline.  This,

24  according to Defendants, "gives us clear insight into [the] meaning [of the terms]."

25  (Reply at 4).

26          Plaintiff, however, argues the only reasonable interpretation of the terms "growth"

27  and "net commissions income" includes additional auctions held or sponsored by R&S

28  LLC, whether or not specifically contemplated at the time the Plan was established.

1    Plaintiff contends it is unreasonable for him, or anyone else in his position, to assume that
2    any future income directly associated or attributable to his efforts would be excluded from
3    those auctions not in existence prior to the establishment of the Plan.   According to
4    Plaintiff, defining those terms based solely on commissions revenue derived from the
5    Scottsdale and Monterrey auctions makes little sense if, for example, R&S LLC had
6    decided to stop holding auctions, which it had discretion to do, in those two locations.   To
7    assert otherwise would be contrary to the plain meaning of the word "growth" because
8    additional company "growth" would quite literally be excluded from the calculus.

9         The Court finds both interpretations reasonable.   Consequently, the Plan's language
10   is ambiguous.   However, the Court need not examine extrinsic evidence to determine which
11   interpretation prevails.   The Court need only determine whether Alcazar's interpretation
12   constitutes an abuse of discretion.   *See Bratton v. Metro. Life Ins. Co.*, 439 F. Supp. 2d
13   1039, 1050 (C.D. Cal. 2006) ("[W]e cannot substitute our judgment for the
14   administrator's.") (quoting *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d
15   869, 879 (9th Cir. 2004)). For the reasons discussed below, the Court finds they did not.

16        *B.  Abuse of Discretion*

17        "Traditional summary judgment principles have limited application in ERISA cases
18   governed by the abuse of discretion standard."  *Stephan v. Unum Life Ins. Co. of Am.*, 697
19   F.3d 917, 929 (9th Cir. 2012) (citing *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th
20   Cir. 2009)).   A court reviews a denial of benefits under an abuse of discretion standard,
21   rather than *de novo*, if the plan benefit gives the administrator or fiduciary discretionary
22   authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone*
23   *Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If "'the abuse of discretion standard
24   applies in an ERISA benefits denial case, a motion for summary judgment is,' in most
25   respects, 'merely the conduit to bring the legal question before the district court.'"  *Stephan*,
26   697 F.3d at 930 (internal citation omitted).   Here, the abuse of discretion standard clearly
27   applies because § 7.04 of the Plan states the Administrator has "sole and absolute
28   discretion" to "make all initial determinations with respect to filed claims" and reconsider

any denials and determine whether the denial will be upheld or reversed.

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle N.F.L. Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Concrete Pipe & Prods. of Ca., Inc. v. Construction Laborers Pension Trust for Southern Ca.*, 508 U.S. 602, 622 (1993)). Essentially, "a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan*, 697 F.3d at 929 (quoting *Conkright v. Frommert*, 559 U.S. 506 (2010)). "This reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)).

Even under the abuse of discretion standard, the court must consider whether the plan administrator labored under a conflict of interest when deciding the benefits claim. *Salomaa*, 642 F.3d at 676. "[T]he existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion" and "[t]he weight of this factor depends upon the likelihood that the conflict impacted the administrator's decisionmaking." *Stephan*, 697 F.3d at 929. "A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968–69 (9th Cir. 2006) (internal citations omitted).

The Court finds Alcazar did not abuse his discretion in rendering his determination

based on an interpretation of "growth" and "net commissions income" tied to only the auctions in existence at the time of the Plan's creation, *i.e.*, the commissions income revenue forming the defined Baseline.   Alcazar provided a clear explanation for his interpretation.  He construed the undefined provisions of the Plan in a manner consistent with the defined terms in the Plan.  There is no evidence that his determination was based on clearly erroneous findings of fact.   Moreover, Alcazar's determination was neither illogical nor implausible under the circumstances.  The Plan, though not clearly drafted, did not account for significant variance in the Baseline—either through the addition of new auctions (as it happened here) or through the subtraction of existing auctions.  Due to the unaccounted-for circumstances, interpreting the Plan language in a way that minimizes unintended windfall for Plaintiff but that, as contemplated at the outset, nevertheless equitably compensates him for his contributions to the company is reasonable.

The fact that Alcazar, as owner of R&S LLC, served also as the Plan Administrator is an indisputable structural conflict of interest.  But this conflict is only one factor in the abuse of discretion determination.  *See Stephan*, 697 F.3d at 929.  Bemiss failed to provide any admissible evidence suggesting the conflict of interest should be weighed heavily enough to support a clear abuse of discretion, *e.g.*, that Alcazar provided inconsistent reasons for denial, failed to consider Plaintiff's claim in good faith, or "has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record."  *Abatie*, 458 F.3d at 968–69.  The presence of a conflict of interest, alone, does not establish obvious foul play and is not sufficient to find an abuse of discretion.

C.  *Remaining Issue of Material Fact*

Having determined Defendants did not abuse their discretion when determining the aggregate value of Plaintiff's vested accrued benefit under the Plan as $134,980.65, the Court turns now to the remaining issue of how much money Plaintiff is owed.  In his deposition, Alcazar testified that in 2016, a $30,000.00 payment was made to Bemiss "in anticipation of the plan value that would be accruing in the future."  (DSOF, Ex. A, p. 187

¶¶ 17-22).  Alcazar stated Bemiss "directed us to send that to an investment account for him."  (*Id.*).  In contrast, Bemiss stated in his declaration that he never received the $30,000.00.  Specifically, he said:

> I am aware than an account with approximately $30,000 was opened and maintained by Josephine Alcazar.  I understood said account to be for my benefit under the Plan, however, I never received the funds in said account, nor was that account ever titled in my name.  I ultimately never received the funds in said account nor have I received a distribution from the Plan of $30,000.  I could see the balance of the account, but had no control over withdrawals of the funds.  After this litigation began, the funds were withdrawn from this account.

(PSOF, Ex. C at ¶ 13).  The parties, in particular the moving party, provided no further evidence or information regarding the whereabouts of the $30,000.00 in question.  On summary judgment, Defendants have the burden to show that Bemiss previously received the money.  Although Bemiss has not filed a cross motion for summary judgment on this issue, he failed to provide admissible evidence to show he did not receive the money.  Accordingly, the Court finds there is a genuine dispute of material fact as to whether $30,000.00 was disbursed to Bemiss.  The ultimate value of the benefit payout Bemiss is entitled to turns on the resolution of this triable factual dispute.  Thus, summary judgment on Plaintiff's first claim for relief is denied.

## II.     Full and Fair Review (Count II)

Plaintiff's second claim for relief against Defendants R&S LLC and Alcazar (as Plan Administrator) alleges Alcazar failed to give a full and fair review by failing to provide (1) specific reasons for the denial of Plaintiff's appeal and (2) adequate records as requested in Plaintiff's appeal in order to determine the proper amount of benefits owed under the Plan.  (Compl. at 11-12 ¶¶ 37-41).  Under ERISA, every employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the

1     appropriate named fiduciary of the decision denying the claim.

2     29 U.S.C. § 1133.

3          Preliminarily, Defendants argue Plaintiff's second claim is barred as a matter of law

4     because top hat plans are exempt from § 503 of ERISA, including 29 U.S.C. § 1133.  (Mot.

5     at 7).  They are not.  Notably, a case relied on by Defendants says as much:

6          Top hat plans are exempt from the participation and vesting provisions of
          ERISA, 29 U.S.C. §§ 1051–1061, its funding provisions, 29 U.S.C. §§ 1081–
7          1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101–1114,
          ***though not from*** its reporting and disclosure provisions, 29 U.S.C. §§ 1021–
8          1031, or ***its administration and enforcement provisions, 29 U.S.C. §§ 1131–
9          1145***.

10    *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000) (emphasis

11    added).  Defendants argue ERISA's fiduciary duty and reporting requirements do not apply

12    to top hat plans.  But § 1133 does not fall into either of those categories.  Indeed, none of

13    the cases Defendants cite to (referenced below) refer to top hat plan exemptions from 29

14    U.S.C. § 1133, or ERISA § 503, an administrative provision "which specifies minimum

15    requirements for a plan's claim procedure."  *Aetna Health Inc. v. Davila*, 542 U.S. 200,

16    220 (2004); *see Demery*, 216 F.3d at 290 (holding top hat plans exempt from 29 U.S.C. §§

17    1024(b) and 1101(a)(1)); *Duggan v. Hobbs*, 99 F.3d 307, 313 (9th Cir. 1996) (holding top

18    hat plans exempt from §§ 1101–1114); *Gilliam*, 488 F.3d at 1193 (noting top hat

19    exemptions under §§ 1101(a)(1), 1081(a)(3), and 1051(2)); *In re New Valley Corp.*, 89

20    F.3d 143, 149 (3d Cir. 1996) (holding top hat plans exempt from § 1102(a)(1)); *Koeplin v.

21    Klotz*, 265 F. Supp. 3d 1039, 1043 (N.D. Cal. 2017) (holding top hat plans exempt from

22    fiduciary requirements and stating top hat administrators cannot be personally liable for

23    their breach); *Conklin v. Brookfield Homes Holdings, Inc.*, 2009 WL 10671564, at *3 (C.D.

24    Cal. Oct. 6, 2009) ("ERISA exempts top hat plans from the fiduciary, funding,

25    participation, and vesting requirements applied to other plans … The enforcement and

26    administrative provisions of ERISA still apply.").

27         Numerous courts have held top hat plans are not exempt from ERISA § 503.[10]  *See

28    ───────────────────
      [10] Further, the Department of Labor clarified in an FAQ on their website that ERISA § 503

*McCarthy v. Com. Grp., Inc.*, 831 F. Supp. 2d 459, 481 (D. Mass. 2011) ("Top hat plans are not excused from ERISA's civil enforcement provisions, including § 503.") (citing *Hampers v. W.R. Grace & Co., Inc.*, 202 F.3d 44, 47 n. 3 (1st Cir.2000); *O'Leary v. Provident Life & Accident Ins. Co.*, 456 F.Supp.2d 285, 289 n. 3 (D. Mass. 2006); *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 324 F.Supp.2d 288, 309 (D. Mass. 2004); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 108 (2d Cir.2008)). Defendants here purportedly make the same failed argument the defendants in *McCarthy* made. *McCarthy*, 831 F. Supp. 2d at 483 ("Because top hat plans are exempt from the fiduciary responsibilities of ERISA, § 1101(a)(1), defendants argue that the 'appropriate named fiduciary' language in the full and fair review provision effectively exempts top hat plans."). Stating "[t]his Court is aware of no federal case which has decided whether the fiduciary reference in § 1133(2) excuses top hat plans from compliance with full and fair review," the *McCarthy* court concluded "top hat plans are subject to the full and fair review with one caveat—the full and fair review need not be undertaken by a 'fiduciary' as there is no fiduciary relationship between administrator and beneficiary in top hat plans." The Court adopts this conclusion. Having determined that the requirements of 29 U.S.C. § 1133 apply to top hat plans, the Court now turns to whether or not Defendants complied with the claim procedure requirements.

"The Secretary of Labor has promulgated regulations which describe the requirements of § 503 in more detail." *McCarthy*, 831 F. Supp. 2d at 481; 29 C.F.R. § 2560.503–1. These regulations require employee benefit plans to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." §

---

applies to top hat plans. *Benefit Claims Procedure Regulation FAQs*, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION, FAQ A–12, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation, (last visited Oct. 22, 2024) ("The regulation establishes requirements for all employee benefit plans that are covered under Part 5 of ERISA, which would include top hat plans. Certain top hat plans are specifically excluded from parts of ERISA (see, e.g., sections 201(2); 301(a)(3); 401(a)(1)), but that exclusion does not apply to section 503, under which the regulation was promulgated.").

2560.503–1(h)(1).  "Full and fair review" of a claim and an adverse benefit determination requires that claimants be provided:

> (i) At least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;
> (ii) The opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;
> (iii) Reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section; and
> (iv) A review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

§ 2560.503–1(h)(2)(i-iv).

Plaintiff argues Defendants did not provide him with "full and fair review" because they did not provide specific reasons for the denial of his appeal and did not provide "adequate records" as requested in his appeal in order to determine the proper value of benefits owed under the Plan.  (Compl. at 11-12 ¶ 14).  The admissible evidence presented does not show Alcazar's review and denial of Bemiss' appeal was procedurally deficient. Alcazar made his initial determination on September 14, 2021.  (DSOF, Ex. 3).  Forty-three days later, on October 27, 2021, Bemiss appealed.  ((DSOF, Ex. 5).  In his appeal, Bemiss provided argument forming the basis of the appeal and requested "financial statements supporting the calculation of commission for [and net revenue from] each auction at all times relevant since the inception date of the Plan."  (*Id.*).  Alcazar responded to Bemiss in an undated letter.[11]  (DSOF, Ex. 6).

Attached to the letter, Alcazar provided "the financial records that will allow you to verify the calculations outlined in the original response to your claim for benefits."  (*Id.*). These records included (1) a chart of gross commissions earned by both Scottsdale and Monterrey auctions from 2011–2020, (2) a profit and loss sheet for the Monterrey auction from January 2010–December 2021, and (3) a profit and loss sheet for the Scottsdale

---

[11] *See supra* n.6.

auction from January 2010–December 2021.  (PSOF, Ex. G).  Alcazar explained in his

appeal response letter the basis for his determination:

> The Plan was adopted in 2012 solely for your benefit. No other Russo &
> Steele employee has ever participated in the Plan. As stated in my letter to
> you [sic] of July 20, 2012, which transmitted the Plan document to you, the
> Plan was adopted for the purpose of allowing you to recognize your value to
> the Company and to allow you to participate in that value. At the time, the
> Company only operated the Scottsdale and Monterrey auctions and the
> benefit was crafted specific to those auctions. The Plan grants me, as Plan
> Administrator, the discretion to interpret the Plan provisions. The decision
> regarding your benefit reflects my intent in offering the Plan to you as
> expressed in my letter of July 20, 2012. For this reason, I am reaffirming that
> decision.

(DSOF, Ex. 6).   This explanation is sufficient to fulfill the "full and fair review"

requirements under 29 C.F.R. § 2560.503–1(h)(2)(i-iv).  As evident by now, the parties'

dispute hinges on differing interpretations of what types of commission income revenue

company "growth" is measured by.   Alcazar reiterated his interpretation of the Plan

language as based on his intent in 2012 when the Plan was created and communicated to

Bemiss.  Moreover, he provided copies of the relevant financial statements requested by

Bemiss which formed the basis for Alcazar's calculation.  Having determined no genuine

disputes of material fact exist as to the adequacy of Defendants' claim review, the Court

grants summary judgment in favor of Defendants on Plaintiff's second claim.

### III.    Equitable Relief (Count III)

Plaintiff's third claim for relief seeks an injunction and specific performance against

Defendants R&S LLC and Alcazar (as Plan Administrator) and alleges Defendants violated

the terms of the Plan by (1) failing to maintain a journal entry or book reserve account for

Bemiss as required under § 4.02 of the Plan, (2) failing to adjust Bemiss' account annually

as required under § 4.03 of the Plan, and (3) failing to provide Bemiss with a statement of

the value of his account as required under § 4.05 of the Plan.  (Compl. at 12-14 ¶¶ 42-49).

In his prayer for relief as to Count III, Bemiss asks the Court to (1) order Defendants to

hold $495,148.00 in a constructive trust for his benefit and (2) enjoin Defendants from

interpreting the Plan to exclude growth and commission income earned from any auctions other than Scottsdale and Monterrey and post-sale commission income. (*Id.* at 16 ¶¶ 1-2).

Under ERISA, a participant may bring a civil action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).   Section 1132(a)(3) is as a "catchall" provision "offering appropriate equitable relief for injuries caused by violations that [Section] 502 does not elsewhere adequately remedy." *Sconiers v. First Unum Life Ins. Co.*, 2011 WL 5192862, at *5 (N.D. Cal. Nov. 1, 2011) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (stating "[a] claim cannot be brought under Section 1132(a)(3) if an adequate remedy is provided elsewhere by the statute," such as § 1132(a)(1)(B)).

Because the Court has determined Alcazar did not abuse his discretion in (1) narrowly interpreting the Plan language and (2) determining the aggregate value of Bemiss' vested accrued benefit under the Plan to be $134,980.65, the equitable relief sought by Bemiss (constructive trust and injunction) is inappropriate.  Additionally, it is unclear from the Complaint what Bemiss' claim for specific performance entails.  To the extent he seeks specific performance in the form of payment of $495,148.00, the Ninth Circuit has held such a claim is not cognizable under § 1132(a)(3). *Oregon Teamster Emps. Tr. v. Hillsboro Garbage Disposal, Inc.*, 800 F.3d 1151, 1160 (9th Cir. 2015).  Adequate legal relief for the unaccounted-for $30,000.000 may be afforded to Bemiss under § 1132(a)(1)(B).  Thus, the Court grants summary judgment in favor of Defendants R&S LLC and Alcazar on Plaintiff's third claim.

**IV.    Statutory Penalties (Count IV)**

Plaintiff's fourth claim for relief seeks statutory penalties against Defendant Alcazar for his alleged failure to comply with a request for information as set forth in Count II. (Compl. at 14-15 ¶¶ 50-54).  Because the Court has determined Alcazar adequately fulfilled his procedural obligations under § 1133 by providing the financial statements supporting

1    his determination, Bemiss' claim for statutory penalties under § 1132(c)(1) fails.  Thus, the

2    Court grants summary judgment in favor of Defendant Alcazar on Plaintiff's fourth claim.

3    **V.    Interference and Retaliation (Count V)**

4           Plaintiff's fifth claim for relief stems from R&S LLC's filing of a lawsuit against

5    Bemiss in the Maricopa County Superior Court.  (Compl. at 15 ¶¶ 55-58).  He alleges the

6    lawsuit "was done primarily to intimidate and harass Plaintiff in retaliation and in an

7    attempt to dissuade Plaintiff from pursuing his benefit under the Plan, and to attempt to

8    offset any benefits owed to Plaintiff under the Plan."  (*Id.* at 15 ¶ 58).

9           29 U.S.C. § 1140 states, in relevant part:

10                  It shall be unlawful for any person to discharge, fine, suspend, expel,
11           discipline, or discriminate against a participant or beneficiary for exercising
             any right to which he is entitled under the provisions of an employee benefit
12           plan, this subchapter, section 1201 of this title, or the Welfare and Pension
             Plans Disclosure Act, or for the purpose of interfering with the attainment of
13           any right to which such participant may become entitled under the plan, this
             subchapter, or the Welfare and Pension Plans Disclosure Act.
14

15          "Section 510 was designed to protect the employment relationship against actions

16   designed to interfere with, or discriminate against, the attainment of a pension right....

17   Simply put, § 510 was designed to protect the employment relationship which gives rise to

18   an individual's pension rights.... This means that a fundamental prerequisite to a § 510

19   action is an allegation that the employer-employee relationship, and not merely the pension

20   plan, was changed in some discriminatory or wrongful way."  *McGath v. Auto-Body N.*

21   *Shore, Inc.*, 7 F.3d 665, 668 (7th Cir. 1993); *see also West v. Butler*, 621 F.2d 240, 245

22   (6th Cir.1980) ("Congress enacted § 510 primarily to prevent 'unscrupulous employers

23   from discharging or harassing their employees in order to keep them from obtaining vested

24   pension rights.'") (internal citations omitted).

25          Bemiss made a claim for benefits after his separation with R&S LLC.  Both

26   lawsuits—this one and the state court action—were filed after termination of their

27   employment relationship.  The employer-employee relationship could not have been

28   affected if it was terminated before the alleged retaliatory measure was taken.

- 18 -

1   Additionally, even if the lawsuit had any impact on Bemiss' and R&S LLC's employment

2   relationship—which it clearly did not—Bemiss failed to provide any admissible evidence

3   supporting his claim that the lawsuit was filed "primarily to intimidate and harass Plaintiff

4   in retaliation" for his claim for benefits.  Bemiss asserts that because R&S LLC seeks relief

5   in excess of $300,000.00 in the state court action, "this is an amount intended to offset any

6   benefit Plaintiff was owed under the Plan." (Doc. 75 at 9).  Plaintiff's claim is unfounded.

7   Thus, the Court grants summary judgment in favor of R&S LLC on Plaintiff's fifth claim.

8                                                    **CONCLUSION**

9          The Court finds Defendant Alcazar did not abuse his discretion in determining the

10  aggregate value of the benefits payable to Plaintiff to be $134,980.65 based on an

11  interpretation of the Plan's language to include only those company commission income

12  revenues derived from R&S LLC's Scottsdale and Monterrey auctions.  However, the

13  parties present controverting evidence as to whether Plaintiff previously received an

14  advance $30,000.00 distribution such that he is only owed $104,980.65.[12]   Because a

15  genuine dispute of material fact remains, the Court denies summary judgment on Count I.

16  The Court also finds Alcazar conducted a "full and fair review" of Plaintiff's claim as

17  required under ERISA, and accordingly grants summary judgment in Defendants' favor on

18  Count II.  For these reasons, Plaintiff is not entitled to equitable relief or payment of

19  statutory penalties; accordingly, the Court grants summary judgment in Defendants' favor

20  on Count III and IV.  Finally, Plaintiff has failed to demonstrate Defendant R&S LLC's

21  filing of a civil suit against Plaintiff in state court affected the parties' employment

22  relationship or otherwise constituted unlawful retaliation; therefore, the Court grants

23  summary judgment in Defendants' favor on Count V.

24         Accordingly,

25         **IT IS ORDERED** Defendants' motion for summary judgment (Doc. 70) is

26  **GRANTED IN PART** and **DENIED IN PART**.  Counts II, III, IV, and V of the Complaint

27  are **DISMISSED WITH PREJUDICE**.  The Court enters the following orders for a bench

28  _____
[12] In reality, the parties present virtually no admissible evidence apart from their own
statements to support their positions on this issue.

1  trial on the remaining issue of fact.

2      **IT IS FURTHER ORDERED** parties shall file the Joint Proposed Pretrial Order

3  no later than **November 27, 2024.**

4      **IT IS FURTHER ORDERED** all Motions in Limine shall be filed no later than

5  **November 27, 2024**.  Responses are due five days afterward.  No replies are permitted

6  unless ordered by the Court.  Prior to filing any Motion in Limine, the parties must confer

7  and discuss the contents of each planned motion.  No Motion in Limine should be filed if

8  the other party does not oppose the relief requested.

9      **IT IS FURTHER ORDERED** the parties shall file Joint Proposed Findings of Fact

10  and Conclusions of Law no later than **November 27, 2024**.

11      **IT IS FURTHER ORDERED** no later than **November 27, 2024**, the parties shall

12  deliver to chambers excerpts of the deposition testimony they propose to present at trial, in

13  compliance with the procedures available on the Court's website (found in Deposition

14  Designation Procedure for Judge Silver), including but not limited to: Plaintiffs

15  highlighting in yellow the portions they wish to offer and Defendants highlighting in blue

16  those portions they wish to offer.  If either party objects to the proposed testimony, a

17  specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin

18  adjacent to the proposed testimony.

19      **IT IS FURTHER ORDERED** a final pretrial conference is set for **December 4,**

20  **2024 at 10:00 a.m**.  The Court will not accept any settlement agreements after the

21  conclusion of the final pretrial conference.

22      **IT IS FURTHER ORDERED** trial to the Court is set for **December 9, 2024 at**

23  **9:00 a.m**.  Estimated length of trial is one day.  No modifications to this date will be made

24  absent extraordinary circumstances.

25  …

26  …

27  …

28  …

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 25th day of October, 2024.

Honorable Roslyn O. Silver
Senior United States District Judge